ADJUDGED IN

# THE PREROGATIVE COURT

OF

## THE STATE OF NEW JERSEY.

### MAY TERM, 1902.

———

WILLIAM J. MAGIE, ORDINARY.

ALFRED REED, VICE-ORDINARY.

———

In the matter of the will of MARY A. GILHAM, deceased.

[Filed July 22d, 1902.]

The probate of a will, contested on the grounds of lack of testamentary capacity in the testatrix and of undue influence, sustained.

———

On appeal from a decree of the Essex county orphans court.

*Mr. Austin Van Gieson* (with whom was *Mr. Joseph Osfield,* of the Rhode Island bar), for Mary E. Stringer, appellant.

*Messrs. Guild, Lum & Tamblyn,* for Mary Gaffey:

*Mr. Alfred F. Stevens,* for the proponents below.

*Mr. William J. Kearns,* for the surviving executor.

MAGIE, ORDINARY.

The appeal in this cause is from a decree of the Essex county orphans court admitting to probate a paper-writing as the last will and testament of Mary A. Gilham, who died domiciled in that county.

The appellant is Mary E. Stringer, who appears to be a grand-niece of the deceased, and was a contestant against the admission of the paper to probate in the court below.

Her contention in this court is confined to two of the grounds which were presented in the contest in the orphans court, viz., testamentary incapacity and undue influence.

As this contention presents mere questions of fact, I shall content myself with stating as briefly as possible the conclusions I have reached after a careful examination of the evidence on the two points on which it is contended that the decree below was erroneous.

*First.* As to the alleged testamentary incapacity.

Appellant does not contend that deceased had become inca-pacitated from senility, nor that she was afflicted by any mental lesion or disease. Her sole claim is that by the administration of morphine and the use of stimulants the mind of the deceased had become so dull and obscured that she was incapable of re-calling the estate of which she was possessed, or of discriminat-ing between those who would naturally be objects of her bounty in distributing her property after her death.

In this contention it is of the first importance to determine from the evidence what amount of morphine had been admin-istered and how frequently it had been administered to the de-ceased, and what amount of the stimulant (which was whiskey) was, in fact, used by the deceased prior to the time of the execu-tion of the instrument in question. Appellant called witnesses who testified respecting the morphine which was administered within their observation, and respecting statements made by de-ceased as to the amount administered to her. This testimony came from witnesses who were not habitually with deceased, but only casual visitors to her at irregular intervals. Their testi-mony is vague and uncertain, and, where it conflicts with the testimony of the attending physician of deceased, who directed

the administration of the morphine and who personally administered it whenever it was administered hypodermically, it cannot be given much weight. For example, the witness who testified to the administration of morphine internally by tablets and simultaneously by hypodermic injections, and to the hypodermic injections being made three or four times a day at a period prior to the execution of the will, may well be presumed to have erred in recollection as to the amount of which she speaks, for the attending physician, a gentleman intelligent and skillful, testified to successive administrations of the kind named by the witness, and the witness has observed or heard thereof from the deceased and confused them in her recollection. From the whole evidence, I think, it conclusively proved that deceased had taken morphine internally, which was administered in the form of tablets, commencing about six months prior to her death, July 23d, 1900, and continued to take it in that form up to about a month before her death. Thereafter morphine was administered hypodermically at intervals of two or three days, until a little before July 1st. Then it was administered hypodermically twice a day until after July 15th, when the will was executed. After that time it was sometimes administered three times a day. The dose administered hypodermically amounted to one-fourth of a grain.

The evidence is also conclusive, in my judgment, that during the period when morphine was administered hypodermically twice a day, the administration was practically at intervals of twelve hours, viz., at about eleven o'clock in the morning and at eleven o'clock at night.

As to the use of whiskey by deceased, a like positive result cannot be discovered from the evidence. That deceased took that stimulant in considerable quantities during the period of six months prior to the execution of the will seems clear. One of the witnesses declares deceased told her that she went to bed drunk every night. I do not think that this statement, however, was intended to indicate a state of habitual intoxication or to be inconsistent with complete sobriety on the next morning.

It must next be considered what effect the evidence discloses to have been produced upon deceased by the use of the drug and the stimulant.

Deceased, at the time of her death, was about seventy-nine years old. She had been twice married, but was then a widow without descendants. She had been for some years living alone in a house owned by her in Newark. About six months before her death she engaged a servant named Mary Gaffey, who lived with her and served her until her death. She had one niece, Felicia Hayes, who also lived in Newark. She had kin living in England, but who they were is not clearly disclosed by the evidence. The only other kin of deceased in this country, so far as the evidence discloses, were the appellant, Mary E. Stringer, and her sister, Ella, who were her grandnieces. They lived in Rhode Island, and had never seen deceased except when they came to Newark on visits to Mrs. Hayes. There seem to have been only two such visits. The appellant had seen deceased six times in all. Her sister had seen deceased less often. The casual intimacy thus disclosed was not kept up by correspondence.

About eighteen months before her death deceased was attacked by cancer in the breast, which eventually involved the internal organs. She was attended by an intelligent and competent physician. Upon his suggesting an operation for the removal of the cancer, deceased declined to submit to it, upon learning from him that the operation would not necessarily result in eradicating the evil. As the disease progressed she suffered, at first, at times, and afterwards more continuously, from excruciating pain. To alleviate this pain and to enable her to endure it was the object of the administration of morphine and the use of the stimulant. When her digestion failed she was sustained by peptonoids and whiskey. Probably she took more whiskey than was prescribed for her, but I find no evidence at all of habitual intoxication.

Appellant produced several witnesses who testified to interviews with deceased during quite a period of time prior to the execution of the will, when they found her stupefied and unable to converse, and evidently unfit to do business. But this condition is precisely what would be expected from the drug administered and the stimulant shown to have been taken, and it is significant that the interviews proved always took place after a morning hypodermic injection or after more or less whiskey had

been taken. The evidence is competent and is not unimportant, but its importance is confined to such inferences as it justifies in respect to the condition of deceased at the time of the execution of the will. The crucial point is her then condition, and evidence that she had been stupefied and incapacitated at periods before and after that time does not necessarily indicate incapacity at that time, and must have very little weight if opposed to sufficient credible evidence of capacity then existing.

Appellant also called several intelligent physicians, qualified as experts, and elicited opinions from them as to the probable effect of the treatment of deceased upon her mental condition. Their testimony is rendered less valuable than it would otherwise have been because counsel for the appellant based their examination upon the vague evidence of the witnesses for appellant, which was assumed to justify belief that the hypodermic administration of morphine in doses of one-quarter grain had been made three times a day prior to the execution of the will. The proponents of the will, however, elicited from them opinions upon the real facts as I have found them established in that respect. These experts did not criticise the treatment of deceased by her physician. Some of them suggest that the doses were large when administered so frequently, but all admit that the attending physician is the best judge of the amount required for the ease of the patient whom he is constantly observing. But they all express the opinion that the treatment, if not open to criticism, must at least have rendered the patient incapable of attending to business.

On the other hand, physicians equally intelligent and experienced testify, upon the same hypothetical questions, that the results would not always agree with those just described. They declare that the treatment proved would not necessarily deprive the patient of the power of transacting business, and they instance cases within their own observation where such power existed.

In this state of the evidence it is manifest that we must give careful consideration to the testimony as to the condition of the deceased at the time of the execution of the will given by those present and taking part therein. The will was drawn and exe-

cuted on Sunday, July 15th, somewhere between ten and twelve o'clock in the morning. No hypodermic injection had been given her since eleven o'clock the night before. The lawyer called to draw the will, who was previously a stranger to her and her affairs, declares that she appeared to be clear minded, and that she gave to him the particulars of her property and the persons to whom she desired it to be given. This information was given to him in the absence of any other person. He drew the will in her presence and read it to her twice, being incited to the second reading because she stated that she did not understand a particular item. Afterwards she expressed satisfaction with the will, and a neighbor, who had lived in the house adjoining that of the deceased for years and had known her well, was called in to act as a witness with the lawyer. The will was again read and, I think, executed. At all events, just before, or just after, the execution of the will itself, the attending physician came in to administer the usual hypodermic injection, and did so. At the sight of him who had so carefully administered to her in her sufferings she expressed a wish to give him something as a memento. After he left the lawyer, at her request, added a codicil at the foot of the will bequeathing to him a diamond ring. The neighbor who was called as a witness testified that deceased knew what she was doing, and intelligently approved of and executed the will and codicil.

If this case rested alone on the evidence of the two attesting witnesses, I could not find the deceased lacking in testamentary capacity without finding them guilty of perjury. But when to their evidence is added that of her intelligent physician, who, for eighteen months, had carefully observed and become thoroughly acquainted with her, and who declares that, at that time, she was clear headed and in her normal mental condition, I find it impossible to reach the conclusion that deceased was not then possessed of that degree of capacity which, under our decisions, is sufficient to qualify one to dispose of property by testament.

*Second.* As to the alleged undue influence.

Appellant does not contend that there is direct proof that the beneficiaries under the will asked deceased to remember them in her will or to leave them some part of her property. There is

nothing to indicate importunity on the part of the beneficiaries. The claim is that they were about her, with ample opportunity to present and urge such requests, and that the will, as made, indicates that such requests must have been urged and must have induced a disposition of the property contrary to that which deceased would otherwise have made.

The beneficiaries are (1) a Mr. Mason, to whom she bequeathed some shares of stock in a manufacturing company, of which he was the manager; (2) a Mrs. Shettle, who was a niece of the deceased by marriage; (3) Mary Gaffey, who was called in the will her "servant and faithful friend;" (4) a Mrs. McKeon, who is called her "true friend and neighbor;" (5) one William F. McKeon, who is called her "friend," and (6) her own niece, Felicia Hayes, to whom is devised and bequeathed some specific real and personal property, and who is made residuary legatee and devisee. Mrs. Hayes and William F. McKeon are appointed executors.

The relation between deceased and Mr. Mason is not made clear by the evidence. Mrs. Shettle had long been intimate with her, and declares that deceased had promised her the greater part or the whole of her property. Mary Gaffey had been her servant for six months, during which she had suffered the exquisite pain of a relentless disease. While there is evidence that deceased had disputes with her upon religious subjects, there is nothing to indicate that Mary had not been the faithful friend which she was declared to be. Mrs. McKeon had been a neighbor for years and deceased and she were intimate. William F. McKeon was a son of Mrs. McKeon, living at home, and had for some years rendered services to the deceased in the management of her house and in the management of her business affairs. Mrs. Hayes was, as has been said, the own niece of deceased.

Being among these surrounding friends and her servant, with whom she was intimate and from whom she had received services, it may well be inferred that she determined to divide her property among them in varying amounts, although she thereby excluded the appellant and her sister, who were but little known to her. Even if it should be inferred that these beneficiaries, or some of them, presented claims to the deceased, and asked or

46

Gilham's Case.

urged her recognition of such claims in the will, the case of appellant is not made out. Influence might thus be exerted upon her, but such influence would not necessarily be undue. To avoid a testamentary disposition on this ground it must be made to appear that the will of the deceased was dominated by those exerting influence, so that she was incapable of resisting, and was compelled to do what she otherwise would not have done. I find no justifiable inference from this evidence of undue influence.

It is suggested, rather than argued, that the circumstances proved justify the inference of a conspiracy between William F. McKeon and the lawyer who drafted the will.

I deem it unnecessary to analyze the evidence on which this suggestion is made. It is sufficient to say that if it raises some suspicion, it falls far short of such proof as is required.

The result is that this decree must be affirmed.